**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KIM SEGEBARTH and SUSAN STONE,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

    v.

CERTAINTEED CORPORATION,

        Defendant.

Case No. 2:19-cv-05500-PD

**FIRST AMENDED COMPLAINT —
CLASS ACTION**

**JURY TRIAL DEMANDED**

---

## <u>CLASS ACTION COMPLAINT</u>

---

Kim Segebarth and Susan Stone, individually and on behalf of all others similarly situated ("Class" or "Plaintiffs"), by and through the undersigned counsel, allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief based on, *inter alia*, investigation conducted by counsel:

### <u>INTRODUCTION</u>

1.      This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a Class of individuals who own or have owned homes or other structures on which CertainTeed Corporation ("CertainTeed" or "Defendant") and its asphalt fiberglass shingles, marketed and sold as the "Horizon" product line (the "Shingles"), are or have been installed.

2.      Defendant's Shingles are plagued by defects in design and manufacturing that result in cracking, fishmouthing, curling, degranulating, and premature deterioration. The results of these defects have allowed for water intrusion and damage to other property. Yet Defendant sold

1

these defective Shingles to the public and made false representations and warranties despite the fact that the Shingles are defective and have and will prematurely fail causing property damage, and costing consumers substantial removal and replacement costs.

3.      This class action seeks damages, injunctive relief, costs, attorneys' fees, and other relief as a result of Defendant's willful, wanton, reckless, deceptive, and/or grossly negligent conduct in causing consumers' structures to suffer damages and preventing consumers from learning of the latent defects in the Shingles.

<strong><u>PARTIES</u></strong>

4.      At all relevant times, Plaintiff Kim Segebarth has been a resident and citizen of South Euclid, Ohio, with an address of 1038 Stonecutters Lane, Ohio 44121.  Mr. Segebarth purchased his newly constructed home in 2008, which was constructed using Defendant's Shingles. His home was part of the Cutters Creek planned unit development which included at least 24 other homes which were also constructed using Defendant's Shingles in 2008 and in 2009.

5.      Mr. Segebarth first became aware of the problems with a neighbor's CertainTeed Fiberglass Horizon shingles installed at home in May 2017 when he received a letter from Armin Guggenheim, the developer of Cutters Creek. Specifically, Mr. Guggenheim discovered and informed Mr. Segebarth and other Cutters Creek homeowners that as part of a home sale of a home located at 1010 Cutters Creek, that the shingles were losing granules and experiencing cracking, which resulted in the replacement of the roof. Mr. Guggenheim's letter further stated that 25 homes in the development have roofs constructed with the same CertainTeed shingles, that CertainTeed was notified of the loss of granules and cracking at 1010 Cutters Creek, and that the homes were inspected by CertainTeed roofing inspectors who claimed that none of the homes had experienced granule loss or cracking. Mr. Segebarth's home was identified by Mr. Guggenheim as one of the

homes affected but allegedly not experiencing granule loss or cracking.

6.      In light of the letter and other information he received from Mr. Guggenheim and others, Mr. Segebarth was of the belief that a warranty claim had been submitted by Mr. Guggenheim for his roof and for all of other homes with the defective CertainTeed shingles.

7.       After not hearing anything from CertainTeed for almost 3 months about the warranty claim, on or around June 28, 2017, Mr. Segebarth wrote to Ms. Patty McDyre, technical sales representative for CertainTeed Roofing Products regarding the status of his claim which he believed was filed by Mr. Guggenheim on behalf of all the homeowners with CertainTeed shingles living in Cutters Creek. He also asked if there was anything that CertainTeed needed from him to expedite his claim.

8.      After not receiving a response from Ms. McDyre or from CertainTeed, on or around July 18, 2017, Mr. Segebarth wrote to Mr. Tom Smith, President of Roofing at CertainTeed Corporation, advising him that he was one of the 25 owners of a planned unit development where Defendant's Shingles were applied to the roofs.  As a result of that letter, a claim was opened under claim number 00665146 for the homes.  Mr. Segebarth asked for help with respect to processing his claim because the information he received thus far from CertainTeed was both incomplete and confusing and because Ms. McDyre or another representative had not responded to his letter.

9.      Thereafter, on or around late July or August of 2017, Mr. Segebarth had his roof inspected by two different roofing inspectors: Mr. Erin Riply and Mr. Scott McNulty. Both inspectors confirmed that the roof contained CertainTeed Horizon shingles which were losing granules, experiencing cracks and prematurely wearing.  Mr. Segebarth was told to replace the roof. Both roofing inspectors provided oral and or written estimates of the cost of repair which was in excess of $7,500.

10. Mr. Segebarth was not aware that the CertainTeed Horizon shingles on his roof were losing granules and cracking until he received the results of the inspections in late July or August 2017.

11. On or around September 7, 2017, Mr. Segebarth was told by CertainTeed that "we have completed the testing and analysis of the shingles samples that were submitted in support of the captioned claim."  The claim was identified as Claim # CR0803547. CertainTeed denied his claim informing him that "the issue reported on your claim form was found to be restricted to this "overlay" portion of the shingles. All heavyweight asphalt shingles with thicker layers of coating asphalt, such as Horizon shingles, will show some type of aging on this portion of the shingle. This condition will not threaten the integrity of the roof. The waterproofing function of your shingles has not been compromised. We are confident that the shingle will continue to perform."

12. Despite denying his claim, CertainTeed offered three settlement options to Mr. Segebarth as follows:

a. Extend the warranty: CertainTeed will extend the term of the warranty on your shingles for additional 5 years from the date of installation.[1] CertainTeed listed in the offer the installation date of 6/15/18.

b. Cash Settlement: CertainTeed will pay a cash settlement based on the time remaining on the warranty (pro-rated amount) and is based on the value of your shingles. There is no compensation for labor costs, tear-off or any other expenses. CertainTeed's cash settlement offer was $750.00; or

c. Replacement with Landmark Shingles: In lieu of the Cash settlement CertainTeed

---

[1] The CertainTeed Horizon Shingles manufactured and sold in 2008 and 2009 came with a 30 year warranty including the 5 year SureStart warranty. See attached copy of the 2009 warranty.

will provide you free Landmark shingles to replace the Horizon shingles currently installed on your property. You will be responsible for any delivery or handling charges that a distributor may impose. CertainTeed's offer was 27 squares of Landmark shingles.

13.     Options b. (Cash Settlement) and option c. (Replacement Landmark shingles) required Mr. Segebarth to execute a general release wherein he would release all claims related to the purchase and installation of the CertainTeed Horizon Shingles.

14.     The cost of repair and replacement for the CertainTeed Horizon shingles, as noted above, far exceeds the value of both the $750.00 cash settlement offer and the 27 squares of Landmark shingles offered by CertainTeed. Mr. Segebarth obtained repair/replacement estimates which exceed $7,500.

15.     Mr. Segebarth's CertainTeed Shingles continue to deteriorate with the loss of granules and cracking and putting his home at risk for further damage.

16.     At all relevant times, Plaintiff Susan Stone has been a resident and citizen of South Euclid, Ohio, with an address of 1037 Cutters Creek Drive, South Euclid, Ohio 44121.  Ms. Stone purchased her newly constructed home in 2008, which was constructed using Defendant's Shingles. Her home was part of the Cutters Creek planned unit development which included at least 24 other homes which were also constructed using Defendant's Shingles in 2008 and in 2009.

17.     Ms. Stone first became aware of the problems with a neighbor's CertainTeed Fiberglass Horizon shingles installed at home in May 2017 when she received a letter from Armin Guggenheim, the developer of Cutters Creek. Specifically, Mr. Guggenheim discovered and informed Ms. Stone and other Cutters Creek homeowners that as part of a home sale of a home located at 1010 Cutters Creek, that the shingles were losing granules and experiencing cracking, which resulted in the replacement of the roof. Mr. Guggenheim's letter further stated that 25 homes

in the development have roofs constructed with the same CertainTeed shingles, that CertainTeed was notified of the loss of granules and cracking at 1010 Cutters Creek, and that the homes were inspected by CertainTeed roofing inspectors who claimed that none of the homes had experienced granule loss or cracking. Ms. Stone's home was identified by Mr. Guggenheim as one of the homes affected but allegedly not experiencing granule loss or cracking.

18.     In light of the letter and other information she received from Mr. Guggenheim and others, Ms. Stone was of the belief that a warranty claim had been submitted by Mr. Guggenheim for her roof and for all of other homes with the defective CertainTeed shingles.

19.     Ms. Stone was not aware that the CertainTeed Horizon shingles on her roof were losing granules and cracking until she received the results of the inspections in late July or August 2017.

20.     On or around September 7, 2017, Ms. Stone was told by CertainTeed that "we have completed the testing and analysis of the shingles samples that were submitted in support of the captioned claim."  The claim was identified as Claim # CR0803538. CertainTeed denied her claim informing her that "the issue reported on your claim form was found to be restricted to this 'overlay' portion of the shingles. All heavyweight asphalt shingles with thicker layers of coating asphalt, such as Horizon shingles, will show some type of aging on this portion of the shingle. This condition will not threaten the integrity of the roof. The waterproofing function of your shingles has not been compromised. We are confident that the shingle will continue to perform."

21.     Despite denying her claim, CertainTeed offered three settlement options to Ms. Stone as follows:

a.     Extend the warranty: CertainTeed will extend the term of the warranty on your

shingles for additional 5 years from the date of installation.[2] CertainTeed listed in the offer the installation date of 6/15/18.

b.      Cash Settlement: CertainTeed will pay a cash settlement based on the time remaining on the warranty (pro-rated amount) and is based on the value of your shingles. There is no compensation for labor costs, tear-off or any other expenses. CertainTeed's cash settlement offer was $777.78; or

c.      Replacement with Landmark Shingles: In lieu of the Cash settlement CertainTeed will provide you free Landmark shingles to replace the Horizon shingles currently installed on your property. You will be responsible for any delivery or handling charges that a distributor may impose. CertainTeed's offer was 28 squares of Landmark shingles.

22.      Options b. (Cash Settlement) and option c. (Replacement Landmark shingles) required Ms. Stone to execute a general release wherein she would release all claims related to the purchase and installation of the CertainTeed Horizon Shingles.

23.      The cost of repair and replacement for the CertainTeed Horizon shingles, as noted above, far exceeds the value of both the $777.78 cash settlement offer and the 28 squares of Landmark shingles offered by CertainTeed. Ms. Stone obtained repair/replacement estimates which exceed $16,500.

24.      Ms. Stone's CertainTeed Shingles continue to deteriorate with the loss of granules and cracking and putting her home at risk for further damage.

25.      Defendant CertainTeed Corporation is a wholly-owned subsidiary of the Paris-based Compagnie de Saint-Gobain.  CertainTeed Corporation's primary place of business is in

---

[2] The CertainTeed Horizon Shingles manufactured and sold in 2008 and 2009 came with a 30 year warranty including the 5 year SureStart warranty. See attached copy of the 2009 warranty.

Malvern, Pennsylvania.

26.     Defendant designed, manufactured, warranted, advertised, and sold defective

Shingles that were installed on thousands of structures throughout the United States.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and the

Class Action Fairness Act of 2005, 28 U.S.C. §1332(d).  The matter in controversy in this class

action exceeds $5,000,000.00 exclusive of interest and costs, and some members of the Class are

citizens of states other than the states in which Defendant is incorporated and has its primary place

of business.

28.     Venue is proper pursuant to 28 U.S.C. §1391(a) because: (1) a substantial part of

the events giving rise to this action occurred in this District; and (2) a substantial part of the

property that is the subject of this action is located in this District.  Defendant has its primary place

of business in this District.  Defendant has also sold its Shingles in this District, and numerous

class members are in this District.

29.     As a result of Defendant designing, manufacturing, marketing, distributing,

promoting, and/or selling, either directly or indirectly through third parties, the Shingles

throughout Pennsylvania, Defendant obtained the benefits of the laws of Pennsylvania and profited

from Pennsylvania commerce.

30.     Defendant conducted systematic and continuous business activities in and

throughout the state of Pennsylvania and otherwise intentionally availed itself of the market in

Pennsylvania through the promotion and marketing of its products.

## FACTUAL ALLEGATIONS

31.     Defendant is responsible for designing, developing, manufacturing, distributing,

marketing, and selling Horizon fiberglass roofing shingles.

32.     Defendant claims on its website:

- With more than 300 Roofing options to choose from, and quality standards that lead the industry, you can rest easily knowing CertainTeed has you covered.

- CONGRATULATIONS! ... and thank you for your recent purchase of one of the fine products in the CertainTeed Roofing Collection™. Since 1904, CertainTeed has been producing quality roofing products that provide long-lasting beauty and protection for homes of every size, style and age. For over 100 years, the basis for our name, "Quality made certain, satisfaction guaranteed," has been our ongoing philosophy.

- Since the early 1900s, CertainTeed Corporation has been an innovator in the building materials industry and today is a leading manufacturer of building materials including residential and commercial roofing, vinyl and fiber cement siding, vinyl windows, composite decking and railing, fiber glass insulation, vinyl fence, and piping products. The company is headquartered in Valley Forge, Pennsylvania, and employs more than 7,000 employees at approximately 50 manufacturing facilities throughout North America. Continuing the 100-year commitment of "quality made certain, satisfaction guaranteed," CertainTeed remains one of the most trusted names in the industry.[3]

33.     Defendant sells its products through a network of retailers, installers, and distributors located across Pennsylvania and the country.

34.     Upon information and belief, Defendant's Shingles were all manufactured using the same basic formula: a fiberglass base mat coated with asphalt surface granules.

35.     Customers of Defendant make purchasing decisions based, in part, upon the information presented by the company through its website, marketing literature, advertisements and warranties.

36.     Defendant has represented and continues to represent to consumers that its Shingles are premium quality, high-performance products.

37.     Defendant claims in its warranties, and advertised and marketed, that its shingles

---

[3] https://www.certainteed.com

have been tested and meet accepted and required industry standards.  It claims on its website the following about its asphalt shingles:[4]

> Fiber glass shingles carry a Class A fire resistance rating from Underwriters Laboratories (UL), the highest fire rating available. Thus, fiber glass shingles are the best protection against the spread of flame on a roof. Fiber glass shingles are so called because they are built on a core, or mat, of fiber glass reinforcement. Asphalt coating is applied directly to this mat, and protective, colored granules are embedded into the coating. Since the mat does not need to be saturated with asphalt, fiber glass shingles are lighter in weight than organic shingles and are more resistant to heat and humidity. Perhaps the most important factor that influences the quality of fiber glass shingle performance is the quality of the mat used in the construction of the shingle. Throughout the roofing industry, the quality of fiber glass mats varies widely.
>
> The American Society for Testing and Materials (ASTM) has established a standard of performance for fiber glass shingles, ASTM D3462, "Standard Specification for Fiber Glass Asphalt Shingles." This test measures the force, in grams, required to tear a shingle in a specialized measuring device known as the "Elmendorf Tear Tester." As measured this way, the minimum tear strength required by ASTM is 1700 grams. In repeated tests conducted regularly by CertainTeed and by independent testing laboratories, all CertainTeed fiber glass shingles have consistently demonstrated the best tear strength rating, and have never failed to comply with all of the requirements of ASTM D3462. This performance is certified by Underwriters Laboratories.

38.    The design and manufacture of Defendant's Horizon shingles was defective, harming Plaintiffs and the Class.

39.    Upon information and belief, Defendant knowingly and intentionally concealed, and failed to disclose that, notwithstanding statements on its website (such as the above), brochures, advertisements and warranties, its Shingles routinely deteriorate by cracking, curling, fishmouthing, leaking, and degranulating far in advance of the expiration of their purported

---

[4] https://www.certainteed.com/resources/1997CTWarranty.pdf

warranty periods.  Defendant's Shingles have deteriorated and will continue to deteriorate at a rapid rate as a result of its durability and resiliency defects.

40.    The defects in the Horizon shingles are latent and not apparent to typical consumers such as Plaintiffs.

41.    Defendant advertised that the Shingles meet certain industry standards despite failing to test and adequately determine the longevity and reliability of its product when used under realistic conditions.

42.    Upon information and belief, Defendant has knowingly and intentionally concealed, and failed to disclose, that it actually had no intention of providing the services set forth in its purported warranties.

43.    Upon information and belief, Defendant has had ample notice of the deficiencies described herein for many years and has been routinely notified by its customers (by way of formal warranty claim submissions by complaining customers and other complaints) that its Shingles are/were defective and not functioning as advertised and warranted.

44.    For example, property owners making claims under Defendant's warranty have been forced to enter confidentiality agreements in order to receive the benefit of Defendant's warranty.  In this way Defendant has prevented consumers at large from becoming aware of the defects in Defendant's Shingles.

45.    Because of Defendant's conduct, Plaintiffs and Class members have not been able to discover the defects until after they have already either installed the Shingles or purchased homes or structures with the defective Shingles.

46.    In addition to damages to their shingles and roofs, Plaintiffs and the Class have also suffered damage to the underlying structures beneath and near where their defective Shingles are

installed.  Ignoring customer complaints and concerns, Defendant has failed to implement changes to its products or warranty procedures to remedy the defects associated with its products.

47.     As a proximate consequence of Defendant's wrongful conduct, Plaintiffs and Class members have suffered damages including:

a.     Plaintiffs have paid inflated prices for their properties that did not account for the deficiencies and defects of the Shingles previously installed on the property;

b.     Plaintiffs have incurred expenses necessary to discover the true nature of the defects in the Shingles and the consequences of the defects;

c.     Plaintiffs have incurred costs for the replacement of their roof Shingles; and

d.     Plaintiffs have incurred costs because the underlying roofs or structures of their homes have been damaged.

48.     Had Defendant not withheld and omitted vital information concerning the design, reliability and performance of the Shingles, Plaintiffs and members of the Class would not have purchased and/or installed them on the roofs of their structures, and/or would not have purchased homes or structures on which the Shingles had been installed.

**<u>Failure to Warn</u>**

49.     Defendant should have or could have reasonably expected that Plaintiffs and members of the Class would be adversely affected by defective Shingles as a result of using the Shingles in a foreseeable way on their homes or other structures.

50.     Defendant failed to properly design, test, and manufacture its Shingles.  The Shingles reached the consuming public, including Plaintiffs, without substantial change or alteration and without warning of the defects alleged herein.

51.     Upon information and belief, Defendant was aware that problems existed with its

Shingles but did not provide warnings with the Shingles or otherwise warn consumers, installers and/or distributors of the problems or dangers that it knew existed.  In fact, to this day, Defendant has concealed its knowledge of the defects and the potential defects in its Shingles from the public.

52.     Defendant never informed Plaintiffs, or other consumers of its Shingles, of the defective nature of its shingles and the resultant inability of such products to last for the periods for which they would reasonably be expected to last, that is, for the length of the limited warranties they were seemingly arbitrarily given. To this day, Defendant has not recalled its defective Shingles.

### Inadequate Testing

53.     Upon information and belief, Defendant did not test the Shingles in their anticipated environments before selling them to the public.

54.     Upon information and belief, Defendant conducted inadequate testing, quality control and research and development on the Shingles and failed to test them for challenges and conditions that they knew or should have known would result in their premature failure.

55.     Upon information and belief, Defendant failed to investigate or test whether various conditions would lead to premature failure of the Shingles.

### Defendant's Shingle Warranty

56.     Defendant warrants its Shingles to be free of manufacturing defects for specific periods of time.  It also makes these warranties transferable to the first purchaser of a structure on which the Shingles were installed by the previous owner.  The warranties are marketed and promoted and create an expectation and belief within the industry, and with ordinary consumers, that the shingles will last as long as the warranty period.  The warranty furthers these expectations by guaranteeing that a shingle will last for a specified period of time.

57.     Horizon shingles were offered with 30 year warranties.

58.     Upon information and belief, Defendant established a warranty period to be advertised and guaranteed for its Shingles without conducting appropriate longevity testing to determine if the warranty period was supported by actual or simulated use.

59.     Upon information and belief, Defendant, who received a litany of complaints from consumers, such as Plaintiffs and other members of the Class, refused to convey effective notice to consumers concerning defects with its Shingles, repair defective roofs fully, or repair property damaged by the premature failure of its product.

## **CLASS ACTION ALLEGATIONS**

### **In Support of Certification of Class under Rule 23(b)(l), 23(b)(2) and 23(b)(3)**

60.     Plaintiffs bring this cause of action individually, and on behalf of the following similarly nationwide situated class of CertainTeed customers (collectively, the "Class"):

> All individuals and entities that have owned, own, or acquired homes or other structures on which CertainTeed Horizon Fiberglass Shingle products are or have been installed. Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest of Defendant, and Defendant's legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

61.     The Class includes two Subclasses:

> **Ohio Subclass**: Members of the Class whose homes or other structures featuring CertainTeed Horizon Fiberglass Shingle products are located in Ohio.

> **Pennsylvania Subclass**: Members of the Class whose homes or other structures featuring CertainTeed Horizon Fiberglass Shingle products are located in Pennsylvania.

62.     The number of persons who are members of the Class and Subclasses described

above are so numerous that joinder of all members in one action is impracticable. Plaintiffs do not know the precise number of Class Members but estimate that there are thousands of Class Members.

63.     Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of CertainTeed complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

(a)     whether the Shingles are defective;

(b)     whether Defendant knew or should have known of the defective nature of the Shingles;

(c)     whether Defendant disclosed the defective nature of the Shingles and/or concealed same;

(d)     whether Defendant owed a duty to Plaintiffs and the Class to exercise reasonable care in the design, manufacture and marketing of the Shingles;

(e)     whether Defendant breached this duty;

(f)     whether the Shingles failed to perform in accordance with the reasonable expectations of ordinary consumers;

(g)     whether the Shingles failed to perform for the time warranted by Defendant;

(h)     whether Defendant breached its the warranties with Plaintiffs and the Class;

(i)     whether the warranties are unconscionable and unenforceable; and

(j)     whether Defendant was unjustly enriched by its conduct.

64.     All questions as to the representations and publicly disseminated advertisements and statements attributable to Defendant at issue herein are similarly common. A determination of CertainTeed's knowledge regarding the misleading nature of the statements made in its website,

brochures, advertisements and warranties and its breaches of contract will be applicable to all members of the Class. Further, whether CertainTeed violated any applicable state laws and pursued the course of conduct complained of herein, whether CertainTeed acted intentionally or recklessly in engaging in the conduct described herein, and the extent of the appropriate measure of injunctive and declaratory relief, damages and restitutionary relief are common questions to the Class.

65.     Plaintiffs' claims are typical of the members of the Class because Plaintiffs purchased defective Shingles from Defendant and then installed them on their homes and structures. The Shingles malfunctioned before the expiration of the applicable warranty period. Plaintiffs, like the Class, have suffered damages associated with the use of Defendant's defective products.

66.     Plaintiffs will fully and adequately represent and protect the interests of the Class because of the common injuries and interests of the members of the Class and the singular conduct of CertainTeed that is or was applicable to all members of the Class. Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class they seek to represent.

67.     A class action is superior to all other available methods for fair and efficient adjudication of this controversy. Absent a class action, it would be economically impractical for the vast majority of the Class members to prosecute individual actions because the amounts that may be recovered by individual Class members would be insufficient in amount to support separate actions. However, the amounts which may be recovered by individual Class members will be large enough in relation to the expense and effort in administering the action to justify a class action. Plaintiffs know of no difficulty to be encountered in the management of this action

that would preclude its maintenance as a class action.

68.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards of conduct for CertainTeed under the laws alleged herein. A class action will cause an orderly and expeditious administration of the claims of the Class. Economies of time, effort and expense will be fostered and uniformity of decision will be ensured.

69.     The claims of the Class may be certified under Rule 23(b)(1), (b)(2) and/or (b)(3). The members of the Class seek not only declaratory and injunctive relief but also sizeable monetary relief.

## ESTOPPEL FROM PLEADING THE STATUTE OF LIMITATIONS

70.     Defendant knew that its Shingles were defective prior to the time of their sale, and intentionally and fraudulently concealed material information and the truth concerning its products from Plaintiffs, members of the Class and the general public, while continually marketing and promoting the Shingles. Defendant's acts of fraudulent concealment include failing to disclose that Defendant's Shingles were defectively manufactured and would deteriorate in less than their expected lifetime, leading to damage.

71.     Because the defects in the Defendant's Shingles are latent and not detectable until manifestation, Plaintiffs and the Class members were not reasonably able to discover that Defendant's shingles were defective and unreliable until recently, despite their exercise of due diligence.

72.     Plaintiffs had no reasonable way to discover this defect until before Plaintiffs filed their original complaint.

73.     Defendant had a duty to disclose that its Shingles were defective, unreliable and inherently flawed in its design and/or manufacture and would fail within their expected period of use, resulting in significant damages.

### FIRST CAUSE OF ACTION
### (Breach of Express Warranty)
### *On behalf of the Nationwide Class*

74.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

75.     In conjunction with its sale of the Shingles, CertainTeed warranted that it would provide an operational product for a particular warranty period or replace the defective product.

76.     Defendant breached the express warranties because, as set forth in detail above, they failed to provide customers with a product that would perform the basic intended and essential functions of shingle products for the specified warranty period.

77.     CertainTeed has received notice of the breaches of warranty alleged herein, by virtue of complaints made by purchasers of its Shingles. Upon information and belief, CertainTeed has received hundreds if not thousands of complaints and other notices from its consumers advising CertainTeed of the defects in its Shingles.

78.     Defendant has failed to provide to Plaintiffs or the Class, as a warranty replacement, Shingle products that conform to the qualities and characteristics that Defendant expressly has warranted are possessed by its products.

79.     Despite requests to do so, CertainTeed has refused, and is continuing to refuse, to adequately repair or replace its Shingles in accordance with warranty terms.  As a result, Plaintiffs and members of the Class were forced and continue to be forced to await the substantially certain failure of their Shingles and suffer the accompanying losses of money associated therewith.

80.     Further, the warranties themselves are unconscionable and unenforceable in that they fail to achieve their specified purpose because they do not provide consumers with an adequate remedy for the failure of the CertainTeed Shingle products.  The warranties do not provide the means for purchasers to repair and replace either the defective product itself, or damages to their homes associated with and caused by these defects. Applying any warranty limitation to avoid the need to repair the defects set forth herein would be unconscionable in that, inter alia, the shingle products contain inherent defects that already were existing at the time of purchase and Defendant knew, or should have known, about the defects, which could not have been discovered by Plaintiffs and the Class at the time of purchase, and purchasers lacked any meaningful choice with respect to the warranty terms.

81.     As a direct and proximate result of Defendant's breach of warranty, Plaintiffs and the Class have suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Implied Warranty of Merchantability)
#### *On behalf of the Nationwide Class*

82.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

83.     The shingle products at issue here are goods and CertainTeed is a merchant in the business of selling such shingle products to consumers. Accordingly, all of CertainTeed's shingle products come within the implied warranty of merchantability.

84.     An implied warranty of merchantability provides that the product is of merchantable quality and fit for its ordinary and intended use.

85.     CertainTeed breached the aforementioned implied warranty of merchantability because the CertainTeed Shingle products were not of merchantable quality or fit for their ordinary

and intended use and because the Shingles contained a defect at the time of their sale that resulted in, and continues to result in, premature deterioration in the form of balding, leaking, and degranulation, when used in a normal, foreseeable and customary way.

86.     The defects at issue are latent defects. Plaintiffs and the Class members could not have known about the shingle products' propensity for premature deterioration.

87.     As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the Class members have suffered damages in the amount of the full purchase price of the CertainTeed Shingle products they purchased or, in the alternative, damages in the amounts by which the values of the shingles as warranted exceed their values in their defective states, or, alternatively, damages in the amounts necessary to repair the shingles, such amounts to be determined at trial.

### THIRD CAUSE OF ACTION
#### (Negligence)
#### *On behalf of the Nationwide Class*

88.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

89.     Defendant owed a duty to Plaintiffs and members of the Class to exercise reasonable care in the design, manufacture and marketing of the Shingles.

90.     Defendant breached its duty to Plaintiffs and the Class by designing, manufacturing, advertising and selling a defective product to Plaintiffs and the Class, and by failing to take those steps necessary to repair or otherwise discontinue selling a defective product to consumers.

91.     Defendant knew, or reasonably should have known, that the Shingles were defective, would fail prematurely and did not perform their intended use.

92.     When they purchased CertainTeed's shingle products, Plaintiffs and the Class members were not aware of their defective nature.

93.     As a direct and proximate cause of the foregoing, Plaintiffs and the Class have suffered and will continue to suffer damages and economic loss as described fully above, in an amount to be proven at trial.

94.     Plaintiffs and the members of the Class are entitled to damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**
***On behalf of the Nationwide Class***

95.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

96.     Plaintiffs and the Class conferred benefits on Defendant by purchasing Defendant's defective Shingles and warranties.

97.     Defendant voluntarily has accepted, retained and enjoyed these profits and benefits conferred by the Plaintiffs and the Class, with full knowledge and awareness that, as a result of its misconduct, Plaintiffs and the Class were not receiving products of the quality, nature, fitness or value that had been represented and warranted by Defendant, and that Plaintiffs and the Class, as reasonable consumers, expected.

98.     Defendant has been unjustly enriched by its wrongful conduct and it would be inequitable for Defendant to retain the conferred benefits without payment of value to Plaintiffs and the Class.

99.     Plaintiffs and the Class seek the disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits, to the extent and in the amount deemed appropriate by the

Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

**FIFTH CAUSE OF ACTION**
**(Fraudulent Misrepresentation, Concealment and Failure to Disclose)**
**_On behalf of the Nationwide Class_**

100.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

101.     During the Class period, Defendant knowingly, fraudulently and actively misrepresented, omitted and concealed from consumers material facts relating to the quality of its Shingles and its warranty process.

102.     Defendant had a duty to disclose to Plaintiffs and the Class members the actual quality of its Shingles and the true nature of its warranty process and whether the shingles met ASTM standards.

103.     The misrepresentations, omissions and concealments complained of herein were material and were made on a uniform and market-wide basis. As a direct and proximate result of Defendant's intentional, willful and malicious concealment and/or suppression of the facts previously described, Plaintiffs and the Class members have been damaged, as alleged herein.

104.     Had Plaintiffs and the Class members been aware of the true nature of CertainTeed's products and business practices, they would not have purchased Shingles from Defendant, or homes with bearing those Shingles.

105.     Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud and/or malice entitling Plaintiffs and Class members to an award of punitive damages to the extent allowed in an amount appropriate to punish or to set an example of CertainTeed.

106.     Plaintiffs and Class members are entitled to damages and injunctive relief as claimed below.

## SIXTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### *On behalf of the Nationwide Class*

107.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

108.     During the Class period, Defendant negligently and/or recklessly misrepresented, omitted and concealed from consumers material facts relating to the quality of its Shingles and its warranty process and whether the shingles met ASTM standards.

109.     Defendant had a duty to disclose to Plaintiffs and the Class members the actual quality of its shingle products and the true nature of its warranties.

110.     The misrepresentations, omissions and concealments complained of herein were negligently or recklessly made to potential customers and the general public on a uniform and market-wide basis. As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiffs and the Class members have been damaged, as alleged herein.

111.     Had Plaintiffs and the Class members been aware of the true nature of CertainTeed's products and business practices, they would not have purchased the Shingles from Defendant, or the homes bearing those Shingles.

112.     Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud and/or malice entitling Plaintiffs and Class members to an award of punitive damages to the extent allowed in an amount appropriate to punish or to set an example of CertainTeed.

113.     Plaintiffs and Class members are entitled to damages and injunctive relief as claimed below.

**SEVENTH CAUSE OF ACTION**
**Violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01, *et seq.*)**
***As to the Ohio Subclass Only***

114.    Plaintiffs re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

115.    Plaintiffs and members of the Ohio Subclass are "persons" within the meaning of Ohio Consumer Sales Practices Act ("OCSPA").

116.    At all relevant times material hereto, Defendant conducted trade and commerce in Ohio and elsewhere within the meaning of the OCSPA.

117.    The OCSPA defines "unfair or deceptive act[s] or practices" to include "representing any of the following": "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;" "(2) That the subject of a consumer transaction is of a particular standard, quality or grade, or that goods are of a particular style or model, if it is not;" and "(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false."

118.    The OCSPA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies.

119.    As detailed more fully in the following paragraphs, the acts and practices alleged herein were intended to and did result in the sale of Shingles in violation of the OCSPA. Defendant's conduct further constitutes breach of warranty and unjust enrichment.

120.    By violating these legal duties, Defendant has engaged in unlawful business acts and practices which deceptive acts or practices within the meaning of the OCSPA.

24

121.    Defendant actively and extensively advertised, marketed and promoted its Shingles based on promises that it was delivering a premium product, designed for long term durability, which would protect the underlying structure and not experience functional or aesthetic deterioration for a period of at least ten years to a lifetime.

122.    Defendant omitted and concealed information about the unreliability and premature balding, leaking, degranulation and other deterioration of its Shingles.  It did so by failing to disclose what it knew about the reliability of the shingles, continuing to make extravagant claims about the durability and quality of the products, and continuing to offer long-term warranties on the products, all while it was actively trying to conceal information about the unreliability of the shingles from public view.

123.    Plaintiffs and members of the Subclass relied on Defendant's representations and omissions in purchasing their Shingles or their homes bearing the same Shingles.  Defendant intended that they should rely on these representations and omissions and remain unaware of the material facts described above.  This conduct constituted consumer fraud, an unfair business practice, and violation of the OCSPA. Had Plaintiffs and the Subclass known that the Shingles were unreliable and would deteriorate prematurely, they would either not have purchased their homes or Shingles or negotiated a better price.

124.    Defendant's failure to disclose the true quality and unreliability of its Shingles was likely to deceive Plaintiffs and the Class.  Defendant has thus committed deceptive acts or practices within the meaning of the OCSPA by engaging in the acts and practices alleged herein.

125.    Plaintiffs and Subclass members are entitled to damages and injunctive relief as claimed below.

## EIGHTH CAUSE OF ACTION
### Violations Of Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01, *et seq.*

126.    Plaintiffs re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

127.    Plaintiffs bring this claim for themselves.

128.    The Ohio Deceptive Trade Practices Act ("DTPA") is codified at Ohio Rev. Code Ann. § 4165.01, *et seq*. The statute permits a "person" who is injured or who is likely to be injured as a result of a deceptive practice to bring an action under the DTPA. Ohio Rev. Code Ann. § 4165.03(A)(1)-(2).

129.    The DTPA defines a "person" broadly to include, *inter alia*, an individual, a corporation, business trust, partnership, unincorporated association, and limited liability company. Ohio Rev. Code Ann. § 4165.01(D). As such, each Plaintiff is a "person" within the meaning of the DTPA.

130.    CertainTeed violated the DTPA by doing the following in the course of its business:

a.    Causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods;

b.    Causing a likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

c.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; and

d.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

131.    As a direct and proximate result of CertainTeed's violations of the DTPA, Plaintiffs

have been injured and suffered actual damages and is entitled to recover such damages together with all other relief allowed under the DTPA.

**NINTH CAUSE OF ACTION**
**Violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01, _et seq.)_**
**_As to the Ohio Subclass Only_**

132.    Plaintiffs re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

133.    The Shingles contained a dangerous design defect as detailed above that caused them to fail.

134.    The design, manufacturing, and/or assembly defect existed at the time these Shingles left the hands of CertainTeed.

135.    Based upon the dangerous defect and its certainty to occur, CertainTeed failed to meet the expectations of a reasonable consumer. The Shingles failed their ordinary, intended use.

136.    The Shingles presented a danger to Plaintiffs and the other sub-class members that cannot be eliminated without significant and expensive repairs.

137.    The design defect in the Shingles was the direct and proximate cause of economic damages to Plaintiffs, as well as damages incurred or to be incurred by each of the other sub-class members. Plaintiffs and members of the Ohio Sub-Classes are entitled to recover such damages along with all other relief allowed under applicable Ohio common law.

**TENTH CAUSE OF ACTION**
**Violation of the Pennsylvania Unfair Trade Practices Consumer Protection Law,**
**73 Pa. Stat. Ann. § 201-1, et seq.**
**_As to the Nationwide Class & Pennsylvania Subclass_**

138.    Plaintiffs re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

139.    Plaintiffs and members of the class are "persons" within the meaning of

Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

140.    At all relevant times material hereto, Defendant conducted trade and commerce in Pennsylvania and elsewhere within the meaning of the UTPCPL.

141.    The UTPCPL defines "[u]nfair methods of competition" and "unfair or deceptive acts or practices" to include: "(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;" "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;" "(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;" and "(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

142.    The UTPCPL is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies.

143.    As detailed more fully in the following paragraphs, the acts and practices alleged herein were intended to and did result in the sale of Shingles in violation of the UTPCPL. Defendant's conduct further constitutes breach of warranty and unjust enrichment.

144.    By violating these legal duties, Defendant has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of 73 Pa. Stat. Ann. § 201-1, *et seq*.

145.    Defendant actively and extensively advertised, marketed and promoted its Shingles based on promises that it was delivering a premium product, designed for long term durability,

which would protect the underlying structure and not experience functional or aesthetic deterioration for a period of at least ten years to a lifetime.

146.    Defendant omitted and concealed information about the unreliability and premature balding, leaking, degranulation and other deterioration of its Shingles.  It did so by failing to disclose what it knew about the reliability of the shingles, continuing to make extravagant claims about the durability and quality of the products, and continuing to offer long-term warranties on the products, all while it was actively trying to conceal information about the unreliability of the shingles from public view.

147.    Plaintiffs and members of the class relied on Defendant's representations and omissions in purchasing their Shingles or their homes bearing the same Shingles.  Defendant intended that they should rely on these representations and omissions and remain unaware of the material facts described above.  This conduct constituted consumer fraud, an unfair business practice, and violation of the UTPCPL. Had Plaintiffs and the class known that the Shingles were unreliable and would deteriorate prematurely, they would either not have purchased their homes or Shingles or negotiated a better price.

148.    Defendant's failure to disclose the true quality and unreliability of its Shingles was likely to deceive Plaintiffs and the Class.  Defendant has thus committed deceptive acts or practices within the meaning of the UTPCPL by engaging in the acts and practices alleged herein.

149.    Plaintiffs and class members are entitled to damages and injunctive relief as claimed below.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray that this case be certified and maintained as a class action and for judgment to be entered upon CertainTeed as follows:

150.    For economic and compensatory damages on behalf of Plaintiffs and all members of the Class and Subclasses;

151.    For restitution;

152.    For punitive damages, as otherwise applicable;

153.    For injunctive and declaratory relief, as claimed herein;

154.    For reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

155.    For such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

June 17, 2021                    By:    /s/ Charles E. Schaffer

Charles E. Schaffer (Bar ID 76259)
CSchaffer@lfsblaw.com
**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500
(215) 592-4663 (fax)

Charles J. LaDuca
charlesl@cuneolaw.com
Brendan S. Thompson
brendant@cuneolaw.com
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
(202) 789-3960
(202) 789-1819 (fax)

Michael A. McShane
mmcshane@audetlaw.com
Clinton Woods
cwoods@audetlaw.com
Ling Y. Kuang
lkuang@audetlaw.com
**AUDET & PARTNERS, LLP**
711 Van Ness Ave., Suite 500
San Francisco, CA 94102
(415) 568-2555

*Attorneys for Plaintiffs KIM SEGEBARTH and SUSAN STONE, individually and on behalf of all others similarly situated*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing First Amended

Complaint - Class Action was filed electronically with the Court and was served via ECF on all

counsel of record on this date.


Date:  June 17, 2021                                    */s/ Charles E. Schaffer*
                                                        Charles E. Schaffer